UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

WILLYVONNE ANDERSON, o/b/o I.J.,       )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )       No.  4:11CV608 RWS
                                        )                (TIA)
MICHAEL J. ASTRUE,                      )
COMMISSIONER OF SOCIAL SECURITY,        )
                                        )
            Defendant.                  )

## REPORT AND RECOMMENDATION

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the denial of Plaintiff's application for Supplemental Security Income under Title XVI of the Social Security Act.   The case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b).

## I.  Procedural History

On January 23, 2007, Plaintiff' mother filed an application for Supplemental Security Income (SSI) on behalf of her daughter and Plaintiff, Ivelia T. Jones.  (Tr. 79-82)  Plaintiff alleges disability beginning January 23, 2007 due to ADHD and depression.  (Tr. 47, 79)  The application was denied, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 46-50, 53)  On January 14, 2009, Plaintiff testified at a hearing before the ALJ.  (Tr. 22-45)  On February 25, 2009, the ALJ issued a decision finding Plaintiff not disabled within the meaning of the Social Security Act since January 23, 2007, the date she filed her application.  (Tr. 11-21) On February 18, 2011, the Appeals Council denied Plaintiff's request for review.  (Tr. 1-3)  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel. Both the Plaintiff and her mother testified. Counsel first questioned Plaintiff's mother, Willyvonne Anderson. Ms. Anderson testified that Plaintiff lived with her. Plaintiff was 14 years old and in the 8th grade. Plaintiff had never been held back in any grades. Plaintiff's older sister, a niece, and a nephew also lived in the home. Ms. Anderson stated that she moved to St. Louis in January 2007 after discovering in December 2006 that her nephews had raped Plaintiff. The nephews were threatening Plaintiff and her mother, and Plaintiff did not feel safe. (Tr. 25-26)

Ms. Anderson further testified that she filed for disability on behalf of Plaintiff because the rape affected her thinking, behaviors, moods, and "just . . . changed her life completely." Ms. Anderson stated that Plaintiff had become disruptive, withdrawn, and sad, and she did not want to be around anyone. In addition, Ms. Anderson's relationship with her daughter changed because the two used to have fun, yet Plaintiff became so withdrawn. After Ms. Anderson discovered that Plaintiff had been raped by her cousins, she took Plaintiff to the Memphis Rape Crisis Center. At that time Plaintiff reported being hurt by her cousins. Ms. Anderson sought psychiatric treatment for Plaintiff, and a child psychiatrist diagnosed ADHD and depression. Since moving to St. Louis, Plaintiff has been attending the Children's Advocacy Center of Greater St. Louis for treatment. She also sees a child psychiatrist, Dr. Larice. (Tr. 27-29)

Ms. Anderson noted that she also received counseling for depression. She went through a family strengths class to learn how to deal with her daughter's issues, and it helped both of them get through things they both endured. Ms. Anderson stated that if she received SSI, she would put Plaintiff in more activities. Ms. Anderson could not afford activities and could barely afford to pay

for daily living.  Ms. Anderson believed that extra activities would take Plaintiff's mind off the rapes.

In addition, the money would help Plaintiff pay for medical expenses and personal hygiene care, and

it would help motivate Plaintiff to get back to normal.  (Tr. 30)

Ms. Anderson also testified that she took Plaintiff to Children's Hospital in November 2007

for rectal bleeding.  Plaintiff told her mother that the rape had caused rectal bleeding off and on.  Ms.

Anderson further stated that Plaintiff had improved but still struggled to keep her head up every day.

Ms. Anderson tried to encourage Plaintiff not to blame herself and to do her best.  In addition, Ms.

Anderson's similar past experience helped guide her daughter.  However, Plaintiff continued to have

daily problems, including problems in school.   Plaintiff's therapist recommended that Plaintiff write

in a journal when she felt depressed.  Ms. Anderson informed Plaintiff's new school, but the

counselors neglected to tell the teachers.  When Plaintiff began writing her thoughts in the journal

during a test, the teacher took the journal, after which Plaintiff became disruptive.  Ms. Anderson

subsequently requested that the teachers allow Plaintiff to journal, and the school accommodated the

request.  (Tr. 30-33)

According to Ms. Anderson, Plaintiff started to tell her a little bit more about what happened.

However, she continued to shut down when talking about it.  Plaintiff did talk to her counselor about

the events surrounding the rape and each time it took place.  In addition, Plaintiff took Seroquel,

Stavzor, and Lexapro for depression, mood swings, and nightmares.  Ms. Anderson testified that

Plaintiff did not sleep well and was sometimes up at 2:30 in the morning watching TV.  Her lack of

sleep affected her the next day in that she would go to school angry, frustrated, and agitated.  When

Plaintiff took Seroquel, she was able to sleep, and her doctor recently increased the dosage.  (Tr. 33-

36)

Ms. Anderson testified that Plaintiff experienced crying spells. For example, the day before the hearing, one of Plaintiff's teachers called to report disruptive behavior that prevented the class from learning. When Ms. Anderson told Plaintiff about the call, Plaintiff broke down and started crying and saying that she could not do the work. Further, Plaintiff felt that everything that happened was her fault, from the broken family to Ms. Anderson's inability to pay the bills. Ms. Anderson encouraged Plaintiff and let her know that nothing was her fault, and they would be fine. However, Plaintiff continued to be paranoid that she would see her cousins and that any callers and visitors would know what happened. As a result, Plaintiff had problems interacting with other people. (Tr. 36-40)

Ms. Anderson opined that, in a given week, Plaintiff experiences 4 bad days. Ms. Anderson needed to make sure Plaintiff woke up, ate breakfast, combed her hair, took a bath, and got dressed. In addition, Plaintiff had few friends, and when she did go to friends' houses, Ms. Anderson requested that the parents call if Plaintiff's behavior changed. Ms. Anderson explained that Plaintiff could be happily playing one minute, then shut down. Plaintiff would tell her mother that she started having thoughts or was having one of those days. Plaintiff's counselor recommended breathing techniques, which helped; however, Plaintiff just wanted to be left alone. (Tr. 40-42)

The ALJ also questioned Plaintiff during the hearing. Plaintiff testified that she was doing fine in school, except for the incidents. She was receiving A's and B's. Plaintiff had two or three friends from school, but none near her home. After school, Plaintiff went to her room and watched TV. During the weekends, if Plaintiff was not home she went to her friend Whitney's house. They would watch movies or go to Whitney's grandmother's home. Plaintiff went to church and participated in activities through the youth program such as praise days and fund raisers. Plaintiff further stated that

she did not participate in any sports or clubs at school, but she did play the bass clarinet in the band. She also enjoyed swimming. (Tr. 42-44)

Upon questioning by counsel, Plaintiff testified that her mom kept her active. However, if her mom did not make her stay active, Plaintiff would go to her room, close the door, and watch TV. With regard to her nightmares, Plaintiff stated that she experienced nightmares twice a week, and she went in and slept with her mom during those episodes. Plaintiff wrote in a journal every time she had a thought that popped in her head or she watched a TV show that reminded her of her cousins. Plaintiff estimated that she wrote in the journal every other day. (Tr. 44-45)

Plaintiff's mother completed a Function Report – Child Age 12 to 18th Birthday. She reported that Plaintiff had problems hearing due to a small hole in the right ear drum. Plaintiff had problems talking clearly, and people that knew Plaintiff could understand her most of the time, but those who did not know her could understand only some of the time. Ms. Anderson explained that Plaintiff dragged her words, slurred, and sounded like a baby. Plaintiff's ability to communicate was limited with regard to explaining why she did something. In addition, Plaintiff could not understand, carry out, or remember simple instructions. With regard to social activities and behavior with others, Plaintiff did not have friends her own age, nor did she play team sports. Ms. Anderson stated that Plaintiff had very low self-esteem and thought she was fat and ugly. She did not want to be embarrassed in front of others, so she tended to play with younger children or become very quiet around other people. Plaintiff's limitations in her ability to care for personal needs was also limited in that she could not wash and put away her clothes, cook a meal for herself, use public transportation by herself, accept criticism, or avoid accidents. Ms. Anderson had to remind Plaintiff to bathe and take care of herself. She had become very destructive with her things, and she became very sad and

cried when something was wrong or someone corrected her. In addition, Plaintiff was unable to work on arts and craft projects, finish what she started, or complete chores. Ms. Anderson summarized that Plaintiff felt guilty and ashamed, and she always looked sad. She had also become more agitated and withdrawn. Her grades had fallen, and she exhibited a hopeless attitude. (Tr. 89-96)

### III. Medical and Educational Evidence

On December 11, 2006, Plaintiff filed a police report claiming that she was forcibly raped by 3 family members. The rapes had occurred between October 11 and December 11, 2006. (Tr. 86-88)

On March 8, 2007, Kate Drewry, MSW, LCSW, assessed Plaintiff at Children's Advocacy Services of Greater St. Louis. The notes indicate that Plaintiff was raped by her 3 cousins over a period of 2 years. Plaintiff's mom reported that Plaintiff was ruminating, had depressed mood, was withdrawn, cried a lot, and was isolated. She also had flashbacks and nightmares. According to the Trauma Symptom Checklist for Young Children (TSCYC), Plaintiff was experiencing clinically significant levels of anxiety, depression, and post traumatic stress, including heightened levels of avoidance, arousal, intrusion of traumatic memories, and dissociation. Plaintiff completed a Trauma Symptom Checklist for Children (TSCC), which indicated clinically significant levels of depression, anger, post traumatic stress, dissociation, dissociation overt, and sexual concerns – distress. The results of Plaintiff's Child Depression Index (CDI) suggested clinically significant levels of negative self-esteem. In addition, her UCLA Post Traumatic Stress Disorder Index was 50, which indicated post traumatic stress disorder and included symptoms of reexperiencing, avoidance, and hyperarousal. Ms. Drewry recommended Distress Tolerance Training, from which Plaintiff would benefit immediately in her suicidal ideation, aggressive behaviors, and argumentative attitude. Next, Plaintiff should begin Trauma Focused Cognitive Behavioral Therapy to have a safe place to talk about and

work through her trauma.  Ms. Drewry diagnosed post traumatic stress disorder, major depressive disorder, ADHD per report, and a GAF of 65.[1]  (Tr. 138-43)

Plaintiff also experienced behavioral problems in school.  On September 25, 2007, she engaged in a heated verbal exchange with another student, causing a near fight.  She skipped her 5th period class on November 16, 2007, and on April 10, 2008, Plaintiff was pushed by another student and both fell to the floor fighting.  Plaintiff was very aggressive and needed to be restrained by staff. (Tr. 120)

On May 29, 2008, the Tuskegee Team Teachers, completed a Child Functioning Questionnaire.  The teachers found no problems in Plaintiff's ability to acquire, learn, and use information.  However, they noted marked limitations in her ability to get along with other children and authority figures, as well as her ability to take turns and share.  Plaintiff demonstrated extreme difficulty in the areas of being disruptive, talking out of turn; due to unprovoked hostility or anger; and talking constantly, unable to stop talking.  She had moderate difficulty with respecting authority/being obedient.  The teachers noted that when Plaintiff was "manic" her ability to get along with others was challenged.  (Tr. 161-62)

Further, with regard to attending and completing tasks, Plaintiff's level of difficulty was marked in controlling the impulse to blurt out answers; doing tasks without bothering others; and staying on task without being reminded.  The teachers opined that she had extreme difficulty in her ability to tolerate frustration and tendency to be easily distracted.  The teachers explained that Plaintiff

---

[1]  A GAF score of 61 to 70 indicates "some mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).

wanted to be in control, and if she finished a task early, she sometimes distracted others. Plaintiff demonstrated no difficulty with moving about and manipulating objects. She displayed moderate difficulty with periods of unprovoked anxiety. In addition, Plaintiff had no problems with her health and physical well-being. (Tr. 163-66)

On June 6, 2008, J. Carlos da Silva, MD, confirmed he was treating Plaintiff for bipolar disorder, depression and PTSD with a disrupted family and history of abuse and rape. Plaintiff also suffered from obesity, as she weighed 185 pounds at age 13. Dr. da Silva prescribed depakote and risperdal. He noted that Plaintiff was doing very well academically but was still depressed, socially isolated, and expressed occasional suicidal thoughts. Plaintiff was receiving psychotherapy in addition to medication. Dr. da Silva noted that, despite her slow progress, Plaintiff was bright, well-meaning, and a good student with a good prognosis. (Tr. 168)

Dr. Rolando Larice evaluated Plaintiff on July 14, 2008. He noted that Plaintiff was depressed and anxious that someone was trying to harm her. She had behavior problems in that she was touchy and easily annoyed; angry or resentful; didn't follow through with things; lost things; and had poor attention when doing things. She also tended to overeat when she was sad, angry, or depressed. Dr. Larice assessed major depressive disorder, PTSD, and ODD (Oppositional Defiant Disorder), with a GAF of 70. (Tr. 324-36)

On September 15, 2008, Dorothy Denny, MSW, PLCSW, a social worker at Children's Advocacy Services of Greater St. Louis, informed Plaintiff's attorney that Plaintiff underwent psychoeducation about trauma and PTSD symptoms; treatment to increase her ability to regulate affect and behaviors; treatment to increase her ability to use relaxation skills to decrease stress; and gradual exposure work to write down her traumatic memories. Ms. Denny noted that through

relaxation and stress management work, Plaintiff's mood began to stabilize. Ms. Denny then began to work with Plaintiff's narrative to increase the benefits of gradual exposure and modify her cognitive distortions regarding her abuse. Sessions also included crisis relief. Ms. Denny opined that Plaintiff continued to struggle with self-regulation of her mood and frequently needed assistance utilizing coping skills. Future treatment plans included continuing to focus on gradual exposure and changing cognitive distortions; reading her narrative to her mother to promote positive communication about the trauma; and establishing Plaintiff's sense of safety and hope for the future. Ms. Denny stated that Plaintiff and her mother had been invested throughout the course of treatment, regularly attending appointments and fully engaging in the therapeutic process. Both worked hard to incorporate therapy suggestions into their regular lives. (Tr. 169-70)

Ms. Denny provided a follow-up letter dated December 18, 2008. Ms. Denny stated that she had seen Plaintiff eight times since September 2008. Treatment during that time continued to focus on increasing Plaintiff's ability to use positive coping strategies to cope with PTSD symptoms. Plaintiff showed progress in utilizing a larger range of coping strategies to address her posttraumatic symptoms. However, her mood remained variable, likely due to a number of environmental stressors including financial difficulties in the family, seeing one of her abusers, changing schools, and the holiday season. Treatment, although a slow process, seemed to be helpful to Plaintiff. Despite the gains made, Plaintiff continued to require assistance in utilizing coping skills. Ms. Denny noted that Plaintiff's mother was instrumental in helping form a support system for Plaintiff. These systems were essential to helping Plaintiff manage her PTSD and depressive symptoms and would likely remain important for some time. Ms. Denny further stated that Plaintiff and her mother were invested throughout the course of treatment and that Plaintiff's mother appeared to invest a large amount of

time, energy, and effort in providing support to Plaintiff, providing for her needs, incorporating suggestions made in therapy, and anticipating challenges to Plaintiff's healing process. (Tr. 204-05)

On December 15, 2008, Dr. Rolando Larice completed a Mental Residual Functional Capacity Questionnaire. He noted that he had seen Plaintiff 3 times in the office for about 30-45 minutes. He assessed major depression, PTSD, and ODD. Her GAF was 70. Dr. Larice noted fairly good response to treatment. She took Celexa and Seroquil, which did cause some lethargy and fatigue. Plaintiff displayed some sadness and worry, but her prognosis was fair to good. In addition, Dr. Larice reported that Plaintiff became angry when things did not go her way or when she did not get what she wanted. She was seriously limited but not precluded in accepting instructions and responding appropriately to criticism; getting along with peers without unduly distracting them or exhibiting behavioral extremes, and dealing with normal work stress. (Tr. 212-16)

On December 18, 2008, Ms. Denny and Ms. Drewry completed a Mental Residual Functional Capacity Questionnaire, noting weekly appointments with Plaintiff since March 2007. Diagnoses included PTSD (DSM-IV 309.81) and Major Depressive Disorder, Recurrent, in full remission (DSM-IV 296.36). They also noted economic problems, problem with primary support group, and a GAF of 63. Treatment included individual psychotherapy with positive response but slow progress. Ms. Denny and Ms. Drewry reported, "[Plaintiff] experiences PTSD symptomatology including re-experiencing (intrusive, distressing recollections, feeling as if it were recurring, psychological and physiological reactivity on exposure), avoidance (efforts to avoid people and places, thoughts and feelings, feeling estranged, and diminished pleasure), and increased arousal (irritability, difficulty concentrating, hypervigilance) following her multiple sexual abuse traumatic experiences by cousins." Further, they opined that her prognosis was good with long-term treatment. They noted that PTSD

impacted Plaintiff's ability to concentrate in class and on schoolwork, as well as social peer relationships. Plaintiff's signs and symptoms included appetite disturbance with weight change; feelings of guilt or worthlessness; recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; persistent disturbances of mood or affect; and apprehensive expectation. Ms. Denny and Ms. Drewry explained that Plaintiff's PTSD exacerbated her ability to handle typical daily stressors on her own and impeded her ability to concentrate on the task at hand when symptoms were pronounced. They noted that Plaintiff's symptoms had waves of differing intensity, which were improving but were more problematic at times. They opined that Plaintiff would miss 3 days of work/school a month due to her impairments. Plaintiff had a large support system which, if removed, would make it extremely difficult for Plaintiff to succeed. (Tr. 206-10)

Ms. Denny and Ms. Drewry also completed a Child Functioning Questionnaire on January 8, 2009. They noted only moderate difficulty in demonstrating problem solving skills, stating that Plaintiff was almost always able to understand and integrate the information learned during a session. However, they also had observed PTSD and depression interfere with small problems in terms of communication or conflict resolution with others, by reports of interactions at home or school. In addition, Plaintiff had moderate difficulty with tolerating frustration, and she was working on this skill in therapy. They had no concerns over Plaintiff's ability to move or manipulate objects, noting that the work with Plaintiff was primarily on a mental and emotional level. Ms. Denny and Ms. Drewry noted that, per the mother's report, Plaintiff had marked difficulty in following proper nutritional expectations and disturbance in eating or sleeping patterns. They stated that Plaintiff required a good deal of external emotional support to help her address her feelings of fear, sadness, and anxiety. They also noted reports that Plaintiff withdrew from family or other enjoyable activities every couple weeks

11

and that she achieved goals slowly with setbacks based on PTSD or depressive mood symptoms. Further, Plaintiff experienced times when she ate or slept more than other children due to her depression. Last, Ms. Denny and Ms. Drewry indicated that Plaintiff always acted appropriately in the one-on-one setting. Her current GAF was 70. (Tr. 237-43)

## IV. The ALJ's Determination

In a decision dated February 25, 2009, the ALJ noted the three-step sequential process to determine whether an individual under the age of 18 is disabled, along with the applicable regulations. The ALJ then found that Plaintiff was an adolescent and had not engaged in substantial gainful activity at any time relevant to the decision. Plaintiff had the following severe combination of impairments: post traumatic stress disorder and depression in full remission. However, she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Further, she did not have an impairment or combination thereof that functionally equaled the listings. Thus, the ALJ determined that Plaintiff had not been disabled, as defined by the Social Security Act, since filing her application on January 23, 2007. (Tr. 11-14, 20)

Specifically, the ALJ assessed Plaintiff's degree of limitation in each of the six functional domains, noting that he considered all symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence. The ALJ noted the testimony from Plaintiff's mother regarding the sexual assault, Plaintiff's symptoms, and her progress with therapy. He also noted Plaintiff's testimony that she received A's and B's in school and had a few friends, as well as the fact that she participated in her church's youth program and played clarinet in the school band. In addition, the ALJ assessed the records and questionnaires provided by the

Children's Advocacy Services of Greater St. Louis. He also noted the medical records from Drs. da Silva and Larice. The ALJ determined that the evidence in the record failed to support allegations of a severe and debilitating impairment or combination of impairments. Instead, the treatment notes indicated mental impairments that appeared troublesome but did not impose extreme or even marked limitations in any of the six domains. (Tr. 14-16)

With regard to acquiring and using information, the ALJ determined that Plaintiff had less than marked limitation in this area. Further, the ALJ found that she had less than marked limitation in attending and completing tasks, in interacting and relating with others, and in the ability to care for herself. The ALJ also determined that Plaintiff had no limitation in moving about and manipulating objects or in health and physical well-being. Thus, the ALJ concluded that Plaintiff was not disabled under the Social Security Act. (Tr. 17-21)

## V. Legal Standards for Child Disability Cases

20 C.F.R. § 416.906 provides the definition for disability in children. That provision states:

> If you are under age 18, we will consider you disabled if you have a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

In determining disability, the ALJ must utilize a sequential evaluation process set forth in 20 C.F.R. § 416.924. The ALJ first determines whether plaintiff is doing substantial gainful activity. If so, the plaintiff is not disabled. 20 C.F.R. § 416.924(b). If the plaintiff is not working, the ALJ considers plaintiff's physical or mental impairment(s) to determine whether plaintiff has a medically determinable impairment(s) that is severe. If the impairment(s) is not medically determinable or is a slight abnormality that causes minimal limitations, the ALJ will find that plaintiff does not have a

severe impairment and is not disabled. 20 C.F.R. § 416.924(c). If the impairment(s) is severe, it must meet or medically or functionally equal the listings. 20 C.F.R. § 416.924(d); see also Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853 (8th Cir. 2003) (setting forth the three-step sequential steps to determine disability in children). The listings for mental disorders in children are contained in 20 C.F.R. Part 404, Subpart P, §§ 112.00-112.12.

Further, when determining functional limitations, 20 C.F.R. § 416.926a(a) provides that where a severe impairment or combination of impairments does not meet or medically equal any listing, the limitations will "functionally equal the listings" when the impairment(s) "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." The ALJ considers how a plaintiff functions in activities in the following six domains: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating to others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1). An impairment(s) is of listing-level severity if a plaintiff has "marked" limitations in two of the domains in paragraph (b)(1) or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d).

A "marked" limitation "interferes seriously with [a claimant's] ability to independently initiate, sustain, or complete activities. [A claimant's] day-to-day functioning may be seriously limited when [the] impairment(s) limits only one activity or when the interactive and cumulative effects of [the] impairment(s) limit several activities." 20 C.F.R. § 416.926a(e)(2)(i). With regard to an "extreme" limitation, a claimant satisfies this standard where the "impairment(s) interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities. [A claimant's] day-to-day functioning may be very seriously limited when [the] impairment(s) limits only one activity or

when the interactive and cumulative effects of [the] impairment(s) limit several activities." 20 C.F.R. § 416.926a(e)(3)(i). While this limitation is greater than a marked limitation, "'Extreme' limitation is the rating we give to the worst limitations. However, 'extreme limitation' does not necessarily mean a total lack or loss of ability to function." Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not reweigh the evidence or review the record de novo. Id. (citation omitted). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id.; Clarke v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

The ALJ may discount plaintiffs subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Id.; Ricketts v. Secretary of Health and Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[2] standards and whether the evidence so contradicts plaintiff's subjective

---

[2]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler,

complaints that the ALJ could discount his testimony as not credible. <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. <u>Marciniak</u> 49 F.3d at 1354.

## VI. Discussion

Plaintiff raises two claims in her brief in support of the complaint. First, she argues that the ALJ failed to properly consider the domains. Next, she contends that the ALJ failed to consider the effects of a structured environment on Plaintiff's ability to function. The Defendant, on the other hand, asserts that substantial evidence supports the ALJ's analysis of the domains of functioning. The undersigned finds that the ALJ properly considered Plaintiff's domains of functioning and the effects of a structured environment on Plaintiff's ability to function.

## A. Acquiring and Using Information

With regard to acquiring and using information for adolescents:

> In middle and high school, you should continue to demonstrate what you have learned in academic assignments (e.g., composition, classroom discussion, and laboratory experiments). You should also be able to use what you have learned in daily living situations without assistance (e.g., going to the store, using the library, and using public transportation). You should be able to comprehend and express both simple and complex ideas, using increasingly complex language (vocabulary and grammar) in learning and daily living situations (e.g., to obtain and convey information and ideas). You should also learn to apply these skills in practical ways that will help you enter the workplace after you finish school (e.g., carrying out instructions, preparing a job application, or being interviewed by a potential employer).

20 C.F.R. § 416.926a(g)(2)(v).

---

739 F.2d 1320, 1322 (8th Cir. 1984).

The record shows that Plaintiff did well academically, supporting the ALJ's determination that her limitation in this domain was less than marked. For instance, Plaintiff's mother testified that Plaintiff had not been held back in school, and Plaintiff stated that she was receiving As and Bs in school. (Tr. 25, 42) In addition, Dr. da Silva noted that Plaintiff was bright, well meaning, and a good student with a good prognosis with appropriate care. (Tr. 168) The ALJ relied on this information in making his determination. (Tr. 14-15) Indeed, in the Brief in Support of the Complaint, Plaintiff does not argue that Plaintiff has a marked limitation in this area. Thus, the undersigned finds that the ALJ properly determined that Plaintiff's limitation in the domain of acquiring and using information was less than marked. See e.g., England v. Astrue, 490 F.3d 1017, 1021 (8th Cir. 2007) (concluding that the ALJ's assessment was supported by substantial evidence where Plaintiff presented evidence of low intellectual functioning yet the ALJ found the IQ tests scores were less than two standard deviations below the mean, medical records showed only moderate limitations in carrying out work-related activities, and Plaintiff progressed through school while taking some general education classes).

### B. Attending and Completing Tasks

Plaintiff does argue, however, that her limitation in the domain of attending and completing tasks is a marked limitation. In this domain:

> [Adolescents] should be able to pay attention to increasingly longer presentations and discussions, maintain your concentration while reading textbooks, and independently plan and complete long-range academic projects. You should also be able to organize your materials and to plan your time in order to complete school tasks and assignments. In anticipation of entering the workplace, you should be

> able to maintain your attention on a task for extended periods of time, and not be unduly distracted by your peers or unduly distracting to them in a school or work setting.

20 C.F.R. § 416.926a(h)(2)(v). Examples of such limitations are that the claimant is easily distracted or over reactive to stimuli such as sound, movement, or touch; is slow to focus on or fails to complete activities of interest; repeatedly becomes distracted from activities or frequently interrupts peers; is easily frustrated and gives up on tasks; or requires extra supervision to remain engaged in an activity." 20 C.F.R. § 416.926a(h)(3)(i)-(v).

Plaintiff relies on the Child Functioning Questionnaire completed by her 7th grade teachers, indicating that Plaintiff had marked limitations in her ability to control the impulse to blurt out answers and extreme limitations in her ability to tolerate frustration and become easily distracted. (Tr. 163) Plaintiff also notes Dr. Larice's assessment finding that Plaintiff was easily distracted; touchy and easily annoyed; angry or resentful; didn't follow through with things; lost things; and had poor attention when doing things. (Tr. 235) Finally, Plaintiff relies on the questionnaire completed by Ms. Denny and Ms. Drewry noting difficulty in concentration on tasks. (Tr. 210)

Defendant, on the other hand, notes Plaintiff's testimony that she received As and Bs in school and participated in the school band. (Tr. 42-44) Further, in the Mental Residual Functional Capacity Questionnaire completed by Dr. Larice, he opined that Plaintiff had unlimited or very good ability to remember work-like procedures; understand and remember very short and simple instructions; make simple work-related decisions; complete a normal work day and work week without interruptions from psychologically based symptoms; and ask simple questions or request assistance. (Tr. 215) In addition, Ms. Denny stated on January 8, 2009 that Plaintiff focused very well in the one-on-one

therapeutic environment and had no difficulty with attending and completing tasks other than a moderate limitation in her ability to tolerate frustration. (Tr. 239)

The ALJ considered Plaintiff's testimony, as well as the opinions of Dr. Larice and Ms. Denny indicating that Plaintiff had the ability to carry out simple instructions and maintain attention for two hour segments. (Tr. 15-16) Contrary to Plaintiff's assertion, the ALJ gave careful consideration to the evidence in the record, which supported the ALJ's conclusion that Plaintiff had a less than marked limitation in her ability to attend and complete tasks. While Plaintiff may have had some limitation in her ability to attend and complete tasks, the limitations set forth by Plaintiff "do not necessarily comprise the entirety of this domain." England, 490 F.3d at 1022.

## C. Interacting and Relating with Others

Plaintiff next asserts that Plaintiff has marked limitations in her ability to interact and relate with others. In this domain, adolescents:

> should be able to initiate and develop friendships with children who are your age and to relate appropriately to other children and adults, both individually and in groups. You should begin to be able to solve conflicts between yourself and peers or family members or adults outside your family. You should recognize that there are different social rules for you and your friends and for acquaintances or adults. You should be able to intelligibly express your feelings, ask for assistance in getting your needs met, seek information, describe events, and tell stories, in all kinds of environments (e.g., home, classroom, sports, extra-curricular activities, or part-time job), and with all types of people (e.g., parents, siblings, friends, classmates, teachers, employers, and strangers).

20 C.F.R. § 416.926a(i)(2)(v). Examples of limited functioning in this domain include having no close friends or only friends older or younger; avoiding people you know or becoming fearful of meeting new people; having difficulty playing games or sports with rules; or having difficulty

communicating with others through verbal and nonverbal skills.   20 C.F.R. § 416.926a(i)(3).

In support of the assertion that Plaintiff has marked limitations in this domain, she notes the heated verbal exchange and the fight with other students in the school setting.  In addition, Plaintiff points to the questionnaire completed by her teachers indicating that she had marked limitations in getting along with other children; getting along with authority figures; and sharing.  Further, Plaintiff notes that the teachers opined she had extreme difficulty being disruptive due to unprovoked hostility or anger, as well as an inability to stop talking.  (Tr. 162)  Plaintiff also highlights the questionnaires completed by Ms. Denny and Ms. Drewry indicating that Plaintiff's symptoms included efforts to avoid people and places, thoughts and feelings.  (Tr. 206)  The questionnaires additionally noted that Plaintiff's PTSD and depression interfered with her ability to deal with relatively small problems in terms of communication or conflict resolution with others.  (Tr. 238)

However, the Defendant correctly states that Ms. Denny and Ms. Drewry specifically responded to the questions regarding Plaintiff's ability to interact and relate with others that Plaintiff had no difficulty when interacting in the therapeutic setting.  (Tr. 243)  In addition, Dr. Larice opined that Plaintiff was seriously limited but not precluded in accepting instruction and responding appropriately to criticism from supervisors, getting along with peers; and dealing with normal work stress.  (Tr. 215)  Medical records also showed that Plaintiff's depression was in full remission and that Plaintiff's prognosis was good.  (Tr. 206)  Further, Plaintiff's GAF scores ranged from 63 to 70, indicating only mild symptoms or some difficulty in social, occupational, or school functioning, with some meaningful interpersonal relationships.  The ALJ considered all of the evidence in this area, noting that Plaintiff had friends in her class and attended her church youth group.  (Tr. 14)  In addition, GAF scores revealed only mild difficulties in social functioning.  (Tr. 15-16)  Likewise, the

limitations found by Dr. Larice limited but did not preclude her ability to get along with peers. (Tr. 16) The record demonstrates that the ALJ accurately assessed the evidence in the record and found that Plaintiff's limitation in the area of interacting and relating with others had a less than marked affect. See, e.g., Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 668 (8th Cir. 2003) (finding that evidence of relatively minor disciplinary infractions at school with recent behavioral improvements, evidence that other students liked the plaintiff, and observations that plaintiff could communicate and experienced improvement of depression with medication supported the ALJ's determination that the limitations in interacting and relating with others were less than marked).

## D.  Moving and Manipulating Objects

Plaintiff does not contend any disability in this area, and the record does not support limitations in Plaintiff's physical abilities. Indeed, Plaintiff played in the school band and enjoyed swimming. Further, Ms. Denny noted no difficulties in this domain. Thus, the ALJ properly found no limitation in Plaintiff's ability to move and manipulate objects.

## E.  Ability to Care for Oneself

The regulations explain that, in this domain, adolescents:

> should feel more independent from others and should be increasingly independent in all of your day-to-day activities. You may sometimes experience confusion in the way you feel about yourself. You should begin to notice significant changes in your body's development, and this can result in anxiety or worrying about yourself and your body. Sometimes these worries can make you feel angry or frustrated. You should begin to discover appropriate ways to express your feelings, both good and bad (e.g., keeping a diary to sort out angry feelings or listening to music to calm yourself down). You should begin to think seriously about your future plans, and what you will do when you finish school.

20 C.F.R. § 416.926a(k)(2)(v). Limitations that the ALJ may consider include placing inedible

objects in mouth; using self-soothing activities demonstrating developmental regression or having restrictive mannerisms; inability to dress or bathe self in an age appropriate manner; engaging in self-injurious behaviors or ignoring safety rules; inability to spontaneously pursue gratifying activities or interests; and disturbance in eating or sleeping patterns. 20 C.F.R. § 416.926a(k)(3)(1)-(vi).

Here, Plaintiff asserts that Plaintiff had an eating disorder by overeating and that she had expressed suicidal thoughts. The ALJ noted, however, that Plaintiff kept a journal and was making progress with her counselor. (Tr. 14-15) In addition, Dr. Larice indicated that Plaintiff was aware of normal hazards and able to take appropriate precautions. (Tr. 215) She did not have thoughts of suicide or self harm. (Tr. 214, 235) The questionnaire completed by Ms. Denny and Ms. Drewry indicated overeating and oversleeping per Plaintiff's mother's report. However, she had either no or moderate difficulty in all other areas of caring for herself, including proper hygiene, pursuing enjoyable activities, and engaging in self-injurious behavior. (Tr. 241) In light of the reports from Dr. Larice and from Ms. Denny and Ms. Drewry, substantial evidence supports the ALJ's finding of less than marked limitation in the domain of caring for oneself. See, e.g., Blakely v. Astrue, No. 6:09-cv-06115, 2011 WL 848446, at *7-8 (W.D. Ark. March 8, 2011) (finding that substantial evidence supported the ALJ's determination of less than marked limitation in caring for self where consulting examiner found plaintiff could complete her own activities of daily living at an age-appropriate level and the teacher indicated plaintiff could take care of personal hygiene and physical needs and respond appropriately to mood changes).

## F.  Health and Physical Well-Being

Finally, Plaintiff argues that the ALJ should have found some limitation in this domain. With regard to health and physical well-being, the regulations require the ALJ to consider:

the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on your functioning that we did not consider in paragraph (j) of this section. When your physical impairment(s), your mental impairment(s), or your combination of physical and mental impairments has physical effects that cause "extreme" limitation in your functioning, you will generally have an impairment(s) that "meets" or "medically equals" a listing.

20 C.F.R. § 416.926a(l)(2)(v). Limitations in this area include generalized physical symptoms or somatic complaints related to the impairments. 20 C.F.R. § 416.926a(l)(3).

Here, Plaintiff contends that the ALJ should have considered Plaintiff's complaints of fatigue and oversleeping, as well as her eating disorder and obesity, in this domain. However, Defendant correctly notes that the record did not indicate any physical impairments or illnesses. Therefore, substantial evidence supports the ALJ's finding of no limitation in this domain.

## G. Effects of Structured Environment

Plaintiff also contends that the ALJ erred in failing to consider the effects of a structured environment on her ability to function. Under the regulations:

A structured or supportive setting may minimize signs and symptoms of your impairment(s) and help to improve your functioning while you are in it, but your signs, symptoms, and functional limitations may worsen outside this type of setting. Therefore, we will consider your need for a structured setting and the degree of limitation in functioning you have or would have outside the structured setting. Even if you are able to function adequately in the structured or supportive setting, we must consider how you function in other settings and whether you would continue to function at an adequate level without the structured or supportive setting.

20 C.F.R. § 416.924a(b)(5)(iv)(C). Plaintiff contends that a letter written by Ms. Denny demonstrates that a structured environment is necessary to maintain Plaintiff's mental health. (Tr. 204-05) However, the Defendant correctly notes that the ALJ assessed all of the evidence, which

indicated that Plaintiff could function well outside of her structured home. The ALJ noted that Plaintiff needed "a good deal of emotional support." (Tr. 16) However, the ALJ also found that Plaintiff had many friends, obtained good grades, and participated in church youth group events. (Tr. 16) Thus, the undersigned finds that the ALJ adequately considered the effects of a structured setting on Plaintiff's ability to function, and substantial evidence supports the conclusion that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this __2nd__ day of July, 2012.